2010 Ark. App. 598

Jamael Lawann McKNIGHT, Appellant

v.

STATE of Arkansas, Appellee.

No. CA CR 10–182.

Court of Appeals of Arkansas.

Sept. 15, 2010.

Daren Jay Nelson, Warren, Counsel for Appellant.

Dustin McDaniel, Att'y Gen., Christian Harris, Ass't Att'y Gen., Little Rock, Counsel for Appellee.

DAVID M. GLOVER, Judge.

A jury convicted appellant, Jamael McKnight, of the offenses of second-degree battery and first-degree child endangerment related to burns received by his five-month-old daughter. He was sentenced to forty-eight months on the battery conviction and thirty-six months on the child-endangerment conviction, to run consecutively. As his sole point of appeal, he contends that the trial court erred in denying his motion for directed verdict. We affirm.

### Standard of Review

A motion for directed verdict is a challenge to the sufficiency of the evidence. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). The test for determining the sufficiency of the evidence is whether substantial evidence, direct or circumstantial, supports the verdict; substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.* On appeal, the evidence is reviewed in the light most favorable to the appellee, and only the evidence supporting the verdict is considered. *Id.* Guilt can be established without eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Id.* Overwhelming evidence of guilt is not required in cases based on circumstantial evidence, and the test is one of substantiality; to be substantial, the evidence must exclude every reasonable hypothesis other than the guilt of the accused. *Id.* The question of whether

the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide; the reviewing court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

### Trial testimony

Jamael is divorced from the child's mother, Tiffany Walker. She testified that on Friday, March 13, 2009, Jamael picked their child up for his weekend visitation and that the child had no injuries when she was left with him. According to Tiffany, when Jamael brought their daughter home on Sunday afternoon, he told her not to worry but the child had "a little burn." Tiffany explained that when she examined her, the child had several burns—on her stomach, on the side of her thigh, and in her genital area. Tiffany then called the police and had her sister-in-law take her and the child to the emergency room. On Monday, she took the child to see Dr. Jeffrey Rhinehart, a local physician, who referred her to the burn unit at Arkansas Children's Hospital in Little Rock, where she saw Dr. Gerry Jones.

Tiffany stated that Jamael had not contacted her about the burns or informed her in any way until he returned the child Sunday afternoon; that he told her he had put some Vaseline on the burns; that he gave Tiffany some suntan lotion to apply to the burns; and that he told her he had not taken the child to the doctor. Tiffany then identified three photographs taken of the child showing the burns.

On cross-examination, Tiffany stated that the child was doing better; that she had just had her first birthday; that, prior to the injury, Jamael had been regularly picking up the child for visitation; and that there had been no problems before the incident in question. She acknowledged that there is no scarring on the child's leg—"just a little light spot"—and that she has no problems walking.

Lieutenant John Dement, the case agent, testified that he talked to Jamael on two different occasions; and that he was just trying to find out from Jamael what happened. He said that Jamael told him he was trying to give the child a bath in the sink on Friday; that the water faucets had been reversed; that he had put a sock in the drain but it came loose and the water drained out; that he turned on what he thought was the cold water; that when he noticed steam he grabbed his daughter out of the water; that the water hit her left leg and then splashed up on her private area and on her stomach. According to Lt. Dement, Jamael said that she cried when the water hit her; that he put some diaper-rash cream on the burned areas; and that "she seemed okay and was not crying" so he did not see any need to take her to the hospital. Jamael stated to Lt. Dement that he told Tiffany what had happened when he returned the child on Sunday.

Lieutenant Dement stated that he went to Jamael's apartment during the course of the investigation to check on the water faucets; that he observed that the emblems on the plastic handles had been reversed with the "H" on the right and the "C" on the left; that when he turned on the right handle, cold water came out, even though it was marked "H," and when he turned on the left handle, hot water came out, even though it was marked "C." In other words, the emblems had been reversed but not the faucets. He stated that he also tested the temperature of the hot faucet; that it did not come out hot; that the temperature increased gradually; and that it was getting "pretty hot" when he retracted his hand. Lieutenant Dement stated that he interviewed Jamael again at a later time. He characterized Jamael's

second accounting of events as "pretty consistent" with his initial version. He said that Jamael told him the switched emblems found by Lt. Dement had been that way on the day of the injury.

Dr. Gerry Jones testified that he has practiced child-abuse pediatrics since 1978; that on March 17, 2009, he examined the child; that she was seen in the Children's Hospital burn clinic; that she was referred by Dr. Jeffrey Rhinehart; that the purpose of his examination was to determine if any maltreatment had occurred; and that at the end of his examination, he suspected child abuse because the history from Jamael was not consistent with the injuries that he saw and because there had been a significant delay in the child receiving treatment. He explained the term "flow characteristics," *i.e.*, that when a hot liquid spills on a person, it tends to run down with gravity, becoming narrower and narrower as it flows down; that it does not flow down typically with a finely demarked line because the liquid is thinner and less heavy toward the edges; that looking at the photos of the injuries, "the damage would be more toward the start of the wound—close to the chest—if I were seeing a liquid burn"; and that he did not see flow characteristics on the child's burn injuries. Referring to the photographs, Dr. Jones pointed out the straight edges on the burn marks and the triangular shapes, noting that flow burns do not look like that. In particular, he explained that the genital wound had a straight edge, acknowledging, however, that the photo showed a more diffuse burn than a straight-edge burn. He reemphasized that the wounds did not show any flow characteristics. He noted the intact blister on one burn and the broken blister on another. He also explained that if Tiffany had not sought medical attention for her daughter the most likely problem would have been infection; and that an infection could have gotten into the bloodstream and caused general sepsis.

The trial court inquired several times of Dr. Jones during his testimony. Responding to questions from the trial court, Dr. Jones explained that, in his opinion, one burn was so perfectly triangular in shape that it was not made by water; rather, it was more consistent with the application of a hot object. He acknowledged that he could not really offer an opinion as to what the mechanism was because the photos were taken three days after the event; that if the photos had been taken sooner after the burn, that he thought he could have made that determination. Upon further questioning by the trial court, the doctor stated that he did not believe that the location of the burn in the vaginal area necessarily suggested a sexual intent. He said that in child-abuse cases, the delay in seeking treatment is a consideration.

On cross-examination, Dr. Jones explained that he saw the child on March 17; that she returned to the burn clinic on March 24, at which time the burn clinic indicated that the wounds were healed; that the blistered burns were second-degree burns; and that the red, non-blistered burns were first-degree burns.

Upon additional questioning by the trial court, the doctor explained that water burns depended upon the temperature of the water; that 140–degree temperature water could cause full-thickness burns in a matter of a very few seconds; that lesser temperatures could cause partial-thickness burns; and that "there are no studies that would answer how long it would take for a certain degree in a child of this age to get partial thickness." On further cross-examination, Dr. Jones stated that the burns in question were not full-thickness burns; they were partial-thickness burns. In concluding his overall testimony, Dr. Jones

expressed his opinion that the burn in the genital area was made by something other than water.

The State rested and Jamael moved for a directed verdict on both the child-endangerment and the battery charges, both of which were denied by the trial court. Jamael testified in his own defense, telling essentially the same account of the incident that he recounted upon return of the child to Tiffany and in the two interviews with Lt. Dement. There was rebuttal testimony from Lt. Dement and surrebuttal from Jamael concerning the "faucets" being reversed and the type of cream that Jamael put on the wounds. At the close of all of the evidence, Jamael again moved for a directed verdict, and it was again denied.

*First-degree child endangerment*

With respect to his conviction for first-degree child endangerment, appellant cites Arkansas Code Annotated section 5–1–102 (Supp.2009) for the definition of "serious physical injury," which is a "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ[.]" He then argues that his daughter's injuries healed in a week and did not satisfy that definition. The problem with his argument was noted by the trial court in denying his motion for directed verdict. That is, the statute only requires "creating a substantial *risk*" of serious physical injury. Arkansas Code Annotated section 5–27–205 (Repl.2006) provides in pertinent part:

(a) A person commits the offense of endangering the welfare of a minor in the first degree if, being a parent, guardian, person legally charged with care or custody of a minor, or a person charged with supervision of a minor, he or she purposely:

(1) Engages in conduct *creating a substantial risk of death or serious physical injury to a minor[.]*

(Emphasis added.) Consequently, the fact that the child's injuries healed rather quickly and were not permanent does not win the day. If there was a risk of protracted disfigurement, then the statute is satisfied.

Here, the State presented evidence from Dr. Jones that the injuries did not likely occur in the fashion described by Jamael, *i.e.*, that they were more likely caused by a hot instrument, not hot water. The application of a hot instrument to the skin of a person, especially an infant, produces the risk of protracted disfigurement.

"Anticipating" in his brief an argument from the State regarding "intent," Jamael recounts his own version of events in an effort to establish that there was no "intent" to do harm to his daughter. We do not address this portion of his argument because it was not properly preserved by his motion for directed verdict at trial. But even if we were to address it, we would find no merit in this argument. As mentioned previously, in examining a challenge to the sufficiency of the evidence, we look at the evidence in the light most favorable to the appellee, which in this case is the State. In doing so, we do not credit Jamael's version of events.

*Second-degree battery*

In his motion for directed verdict, Jamael argued that there was simply "no intention to do this." Arkansas Code Annotated section 5–13–202 (Supp.2009) provides in pertinent part: "A person commits battery in the second degree if: ... (4) The person knowingly, without legal justification, causes *physical injury* to a person he or she knows to be: ... (C) An individual sixty (60) years of age or older or twelve (12) years of age or younger[.]"

(Emphasis added.) "A person acts knowingly with respect to: (A) The person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist[.]" "Physical injury" is defined as: "(A) Impairment of physical condition; (B) Infliction of substantial pain; or (C) Infliction of bruising, swelling, or a visible mark associated with physical trauma[.]" Ark.Code Ann. § 5-1-102(14) (Supp.2009).

In making his argument, Jamael briefly restates, then compares, his testimony with that of Dr. Jones; contends that the State is relying completely on circumstantial evidence; and concludes that there are "significant questions as to whether or not the State has sufficient evidence to convict Mr. McKnight on second-degree battery."

As further noted by the trial court, intent is a question for the jury. "Like all factual questions, the question of a defendant's intent or state of mind is for the trier of fact to decide, based upon the evidence presented." *Edwards v. State*, 2010 Ark. App. 59, 377 S.W.3d 271.

Here, viewing the evidence in the light most favorable to the State, there was evidence from which a jury could conclude that Jamael's account of events was not truthful and that a hot instrument, not hot water, was what caused the burns. Once his account was rejected, the evidence was consistent with his guilt and inconsistent with any other reasonable conclusion.

Affirmed.

GLADWIN and ABRAMSON, JJ., agree.